**THE O'MARA LAW FIRM, P.C.**
David C. O'Mara
311 East Liberty St.
Reno, Nevada 89501
Tel: 775.323.1321
Fax: 775.323.4082
Email: david@omaralaw.net

**BARNOW AND ASSOCIATES, P.C.**
Ben Barnow*
Anthony L. Parkhill *
205 West Randolph Street, Ste 1630
Chicago, IL 60606
Tel: 312.621.2000

**UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA**

| | |
|---|---|
| KARLA GONZALEZ, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BOYD GAMING CORPORATION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Karla Gonzalez ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant Boyd Gaming Corporation ("Boyd Gaming" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against Defendant for its failure to secure and safeguard the personally identifying information ("PII") of its current and former customers and employees (including Plaintiff), including names, addresses, dates of birth, driver's license information, other government-issued identification information, and Social Security numbers.

1

2. Boyd Gaming is a casino entertainment company that operates 28 gaming properties across ten states.

3. Between approximately September 5 and September 7, 2025, an unauthorized third party gained access to Boyd Gaming's network systems and accessed and acquired files containing the PII of Boyd Gaming's employees and customers, including Plaintiff and Class members (the "Data Breach").

4. Defendant owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII from unauthorized access and disclosure.

5. As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII was exposed as a result of the Data Breach, which occurred between approximately September 5 and September 7, 2025.

6. Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, negligence per se, breach of implied contract, unjust enrichment, and violations of the Nevada Consumer Fraud Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

**PARTIES**

*Plaintiff Karla Gonzalez*

7. Plaintiff is a citizen and resident of Nevada.

8. Plaintiff is an employee of Boyd Gaming. As a condition of providing employment to Plaintiff, Boyd Gaming required Plaintiff to provide it with her PII.

9. Based on representations made by Boyd Gaming, Plaintiff believed that Boyd Gaming had implemented and maintained reasonable security and practices to protect her PII. With

this belief in mind, Plaintiff provided her PII to Boyd Gaming in exchange for receiving employment from Boyd Gaming.

10. At all relevant times, Boyd Gaming stored and maintained Plaintiff's PII on its network systems, including the systems impacted in the Data Breach.

11. Plaintiff received a notice letter from Boyd Gaming notifying her that her PII was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12. Had Plaintiff known that Boyd Gaming does not adequately protect the PII it collects and maintains, she would not have agreed to provide her PII to, or obtained employment from, Boyd Gaming.

13. As a result of the compromise of her PII in the Data Breach, Plaintiff has become a target for cybercriminals' malicious phishing and scam attempts as she has experienced a noticeable increase in the amount of spam calls, texts, and emails she receives.

14. Plaintiff has spent time and made reasonable efforts to mitigate the impact of the Data Breach, including time and effort spent verifying the veracity of the notice letter she received, researching for more information about the Data Breach, dealing with phishing and scam attempts, and reviewing her accounts for potential fraud.

15. Plaintiff has experienced fear, frustration, and stress because her PII was accessed and stolen by unauthorized third parties in the Data Breach, including because she must closely monitor her PII for signs of misuse and identity theft for the rest of her life.

16. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII.

***Boyd Gaming Corporation***

17. Defendant Boyd Gaming Corporation is a Delaware corporation with its principal place of business located at 6465 South Rainbow Boulevard, Las Vegas, NV 89118. It may be served through its registered agent: Corporation Service Company, 112 North Curry Street, Carson

City, NV 89703.

## JURISDICTION AND VENUE

18. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

19. This Court has general personal jurisdiction over Defendant because it maintains its principal place of business in this State and regularly transacts business within this State.

20. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

*Overview of Boyd Gaming*

21. Boyd Gaming is one of the largest casino entertainment companies in the United States and operates 28 gaming properties in ten states (Nevada, Illinois, Indiana, Iowa, Kansas, Louisiana, Mississippi, Missouri, Ohio, and Pennsylvania), and also manages a tribal casino in California.[1]

22. In the regular course of its business, Boyd Gaming collects and maintains the PII of its customers and employees, including Plaintiff and Class members.[2] Boyd Gaming requires customers and employees to provide it with their PII, including the PII stolen in the Data Breach, before it provides them its services or employment.

23. Boyd Gaming knew the risk of a targeted attack for the purpose of stealing PII, such as the Data Breach here, as evidenced by its 2025 Form 10-K filing in which it admits:

---

[1] *Corporate Overview*, BOYD GAMING, https://investors.boydgaming.com/ (last accessed Oct. 10, 2025).

[2] Boyd Gaming, *Annual Report (Form 10-K)* (Feb. 21, 2025), https://app.quotemedia.com/data/downloadFiling?webmasterId=101533&ref=318941284&type=PDF&symbol=BYD&cdn=2b207d13b21b79cee7b4b5d4512d2f9e&companyName=Boyd+Gaming+Corporation&formType=10-K&dateFiled=2025-02-21.

> Breaches of our security measures or information technology systems or the accidental loss, inadvertent disclosure or unapproved dissemination of proprietary information or sensitive personal information or confidential data about us, or our customers, or our employees, including the potential loss or disclosure of such information as a result of hacking or other cyber-attack, computer virus, . . . trickery or other forms of deception or unauthorized use, or due to system failure, could expose us, our customers, our employees or other individuals affected to a risk of loss or misuse of this information.[3]

24. Boyd Gaming further acknowledges "the collection of customer and employee personal information imposes various privacy compliance-related obligations on our business."[4]

25. Boyd Gaming's privacy policy (the "Privacy Policy"), Boyd Gaming promises it is "committed to providing security for personal and business information."[5] It also promises it uses "reasonable methods to protect information."[6] Promises it will share PII with third parties only as authorized in the Privacy Policy.[7]

26. Plaintiff and Class members are current or former customers or employees of Boyd Gaming who entrusted Boyd Gaming with their PII in exchange for obtaining services or employment.

***The Data Breach***

27. On or about September 6, 2025, Boyd Gaming discovered "the unauthorized removal of information from" its network systems.[8] After an investigation, Boyd Gaming determined that between approximately September 5 and September 7, 2025, an unauthorized third party gained access to Boyd Gaming's network systems and accessed, acquired, and removed the PII of Plaintiff and Class members, including their names, addresses, dates of birth, driver's license information, other government-issued identification information, and Social Security numbers.[9]

---

[3] *Id.*
[4] *Id.*
[5] *Privacy Policy*, BOYD GAMING (Mar. 18, 2025), https://web.archive.org/web/20250905004303/https://www.boydgaming.com/privacy.
[6] *Id.*
[7] *Id.*
[8] *Boyd Gaming Corporation Data Breach Notification*, MAINE.GOV (Oct. 1, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/cc4943dd-1067-4966-a6ef-338666abc3d9.html.
[9] *Id.*

5

28. Despite discovering that its customers' and employees' PII was accessed and stolen on or about September 6, 2025, Boyd Gaming waited until approximately October 1, 2025—nearly a month after discovering the Data Breach—to begin notifying Plaintiff and Class members that the Data Breach occurred and that their PII was accessed and acquired by unauthorized persons.

29. Boyd Gaming's failure to promptly notify Plaintiff and Class members that their PII was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited its security lapses could monetize, misuse, or disseminate that PII before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***Defendant Knew that Criminals Target PII***

30. At all relevant times, Defendant knew, or should have known, that the PII it collects and stores was a target for malicious actors. Despite such knowledge, Boyd Gaming failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII from unauthorized disclosures and cyberattacks that they should have anticipated and guarded against.

31. It is well known among companies that store sensitive personally identifiable information that such information—such as the PII stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[10]

---

[10] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

32. PII is a valuable property right.[11] The value of PII as a commodity is measurable.[12] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[13] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[14] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

33. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims. One such example is the development of "fullz" packages, where cybercriminals connect data from a data breach with information from other sources to create a complete dossier on an individual, which can then be sold multiple times and used to commit a variety of fraud.[15]

34. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and

---

[11] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[12] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[13] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[14] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

[15] *See* Julia Kagan, *Fullz: Definition, Examples, Minimizing Risk*, INVESTOPEDIA (Aug. 31, 2022), https://www.investopedia.com/fullz-definition-4684000.

accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[16]

35. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

*Theft of PII Has Grave and Lasting Consequences for Victims*

36. Theft of PII can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[17] [18]

37. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[19]

38. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month

---

[16] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[17] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Oct. 10, 2025).

[18] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[19] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

to resolve issues stemming from identity theft.[20]

39. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[21]

40. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

*Damages Sustained by Plaintiff and Class Members*

41. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Defendant's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## CLASS ALLEGATIONS

42. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

43. Plaintiff brings this action on behalf of herself and all members of the following

---

[20] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Oct. 10, 2025).

[21] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

Class of similarly situated persons:

> All persons whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

44. Plaintiff also brings this action on behalf of herself and all members of the following subclass of similarly situated persons (the "Nevada Subclass):

> All persons residing in Nevada whose personally identifiable information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

45. Excluded from the Class are Boyd Gaming Corporation, and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

46. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

47. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. While Boyd Gaming has not released the total number of individuals affected in the Data Breach, it reported to the Texas Attorney General that approximately 4,300 people in Texas were affected.[22]

48. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII from unauthorized access and disclosure;

   b. Whether Defendant had a duty not to disclose the PII of Plaintiff and Class members to unauthorized third parties;

   c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII;

---

[22] *Data Security Breach Reports*, TEXAS ATT'Y GEN. (Oct. 2, 2025), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

      d.    Whether Defendant breached those duties to protect Plaintiff's and Class members' PII; and

      e.    Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

49. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

50. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

51. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

52. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management

difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

53. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

54. Boyd Gaming owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII it collected and stored.

55. Boyd Gaming knew or should have known the risks of collecting and storing Plaintiff's and all other Class members' PII, and the importance of maintaining secure systems. Boyd Gaming knew or should have known of the many data breaches that targeted companies that collect and store PII in recent years.

56. Given the nature of Boyd Gaming's business, the sensitivity and value of the PII it collects and maintains, and the resources at its disposal, Boyd Gaming should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

57. Boyd Gaming breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII entrusted to it—including Plaintiff's and Class members' PII.

58. It was reasonably foreseeable to Boyd Gaming that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

59. But for Boyd Gaming's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, the Data Breach would not have occurred and their PII would not have been compromised.

60. As a result of Boyd Gaming's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Boyd Gaming's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

61. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

62. Boyd Gaming's duties arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses such as Boyd Gaming of failing to employ reasonable measures to protect and secure PII.

63. Boyd Gaming's duties also arise from state statutes requiring reasonable data security measures, including but not limited to Nev. Rev. Stat. § 603A.210, which states that businesses possessing personal information of Nevada residents "shall implement and maintain reasonable security measures to protect those records from authorized access."

64. Boyd Gaming violated Section 5 of the FTCA by failing to use reasonable

measures to protect Plaintiff's and other Class members' PII, by failing to provide timely notice, and by not complying with applicable industry standards. Boyd Gaming's conduct was particularly unreasonable given the nature and amount of PII it obtains and stores, and the foreseeable consequences of a data breach involving PII including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

65. Boyd Gaming's violations of Section 5 of the FTCA and state data security statutes constitute negligence per se.

66. Plaintiff and Class members are within the class of persons that Section 5 of the FTCA and state data security statutes were intended to protect.

67. The harm occurring as a result of the Data Breach is the type of harm that Section 5 of the FTCA state data security statutes were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

68. It was reasonably foreseeable to Boyd Gaming that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII to unauthorized individuals.

69. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of Boyd Gaming's violations of Section 5 of the FTCA state data security statutes. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost

opportunity costs associated with efforts to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Boyd Gaming's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF IMPLIED CONTRACT

70. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

71. In connection with receiving services or employment, Plaintiff and all other Class members entered into implied contracts with Boyd Gaming.

72. Pursuant to these implied contracts, Plaintiff and Class members provided Boyd Gaming with their PII. In exchange, Boyd Gaming agreed to, among other things, and Plaintiff understood that Boyd Gaming would: (1) provide services or employment to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII; and (3) protect Plaintiff's and Class members' PII in compliance with federal and state laws and regulations and industry standards. Boyd Gaming benefitted from receiving Plaintiff's and Class members' PII, as their PII was necessary for Boyd Gaming to operate its business.

73. The protection of PII was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and Boyd Gaming, on the other hand. Indeed, as set forth *supra*, Boyd Gaming recognized the importance of data security and the privacy of PII in its privacy policy. Had Plaintiff and Class members known that Boyd Gaming would not adequately protect their PII, they would not have provided their PII to Boyd Gaming or obtained services or employment from Boyd Gaming.

74. Plaintiff and Class members performed their obligations under the implied contract when they provided Boyd Gaming with their PII and paid Boyd Gaming or provided their labor to

15

Boyd Gaming.

75. Boyd Gaming breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII, and in failing to implement and maintain security protocols and procedures to protect Plaintiff's and Class members' PII in a manner that complies with applicable laws, regulations, and industry standards.

76. Boyd Gaming's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

77. Plaintiff and all other Class members were damaged by Boyd Gaming's breach of implied contracts because: (i) they provided their PII to Boyd Gaming in exchange for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII has been breached; (v) they were deprived of the value of their PII, for which there is a well-established national and international market; and (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face.

## COUNT IV
## UNJUST ENRICHMENT

78. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

79. This claim is pleaded in the alternative to the breach of implied contract claim.

80. Plaintiff and Class members conferred a monetary benefit upon Boyd Gaming in the form of monies paid to Boyd Gaming for products and services or provided the value of their labor, and through the provision of their PII. Plaintiff and Class members did so with an implicit understanding that Boyd Gaming would use some of these payments or the value created by their

labor to protect the PII it collects, stores, uses to provide products and services or employment.

81. Boyd Gaming accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. Boyd Gaming also benefitted from the receipt of Plaintiff's and Class members' PII, as this was used to facilitate its business operations.

82. As a result of Boyd Gaming's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments or labor made with reasonable data privacy and security practices and procedures that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

83. Boyd Gaming should not be permitted to retain the money belonging to Plaintiff and Class members because Boyd Gaming failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for or provided labor for and that were otherwise mandated by federal, state, and local laws and industry standards.

84. Plaintiff and Class members have no adequate remedy at law.

85. Boyd Gaming should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT V
### VIOLATION OF THE NEVADA CONSUMER FRAUD ACT
### NRS §§ 41.600, *et seq.* ("NCFA")
*On behalf of Plaintiff and the Nevada Subclass*

86. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

87. Plaintiff brings this claim individually and on behalf of the Nevada Subclass.[23]

88. Pursuant to the NCFA, "[a]n action may be brought by any person who is a victim of a consumer fraud." NRS 41.600(1).

89. Boyd Gaming offered and continues to offer entertainment services in the State of

---
[23] As used in this claim, "Class members" refers to members of the Nevada Subclass.

Nevada.

90. Plaintiff and Class members purchased and received gaming services from Boyd Gaming for personal, family, or household purposes.

91. Pursuant to the NCFA, a deceptive practice pursuant to NRS 598.0915 constitutes a consumer fraud pursuant to the NCFA.

92. Boyd Gaming engaged in consumer fraud in violation of the NCFA by failing to implement and maintain reasonable security measures to protect and secure its customers' and employees' PII in a manner that complied with applicable laws, regulations, industry standards, and Boyd Gaming's representations.

93. NRS 598.0915 lists 16 deceptive trade practices. Boyd Gaming's representations that it would adequately protect Plaintiff's and Class members' PII constitute as the following violations of the NCFA:

    a. "Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model." NRS 598.0915(7).

    b. "Advertises goods or services with intent not to sell or lease them as advertised." NRS 598.0915(9).

    c. "Knowingly makes any other false representation in a transaction." NRS 598.0915(15).

94. Boyd Gaming makes explicit statements to its customers and employees that their PII will remain private.

95. Due to the Data Breach, Plaintiff and Class members have lost property in the form of their PII. Further, Boyd Gaming's failure to adopt reasonable practices in protecting and safeguarding its customers' and employees' PII will force Plaintiff and Class members to spend time or money to protect against identity theft. Plaintiff and Class members are now at a higher risk of identity theft and other crimes. This harm sufficiently outweighs any justifications or

motives for Boyd Gaming's practice of collecting and storing PII without appropriate and reasonable safeguards to protect such information.

96. As a result of Boyd Gaming's violations of the NCFA, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII which remains in Boyd Gaming's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

     E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

     F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: October 10, 2025                Respectfully submitted,

/s/    David C. O'Mara, Esq
David C. O'Mara
Nevada Bar No. 8599
**THE O'MARA LAW FIRM, P.C.**
311 E. Liberty Street
Reno, Nevada 89501
Tel: 775.323.1321
Fax: 775.323.4082
david@omaralaw.net

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

\**Pro hac vice* forthcoming